

Signed August 01, 2014.

_____
Ronald B. King
United States Chief Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MARTHA L. MONACO, | § | CASE NO. 09-54204-RBK |
| | § | |
| DEBTOR | § | CHAPTER 7 |
| | § | |
| | § | |
| | § | |
| ADAM L. MONACO AND HOPE ELAINE MONACO, | § | CASE NO. 09-54772-RBK |
| | § | |
| | § | |
| DEBTORS | § | CHAPTER 7 |
| | § | |
| | § | |
| TAG INVESTMENTS, LTD., | § | |
| | § | ADVERSARY NO. 10-5026-RBK |
| VS. | § | (CONSOLIDATED WITH |
| | § | ADVERSARY NO. 10-5027-RBK) |
| MARTHA L. MONACO AND ADAM MONACO | § | |
| | § | |

### OPINION

Martha L. Monaco and Adam L. Monaco (collectively "Debtors") were officers of an

entity named Building by Monaco, Inc., d/b/a Monaco Homes ("BBM"), which specialized in

residential construction.  BBM filed a Chapter 7 case on August 14, 2009 (Case No. 09-53104).

Martha L. Monaco filed a Chapter 7 case on October 27, 2009 (Case No. 09-54204), and her son,

Adam L. Monaco, filed a Chapter 7 case on December 1, 2009 (Case No. 09-54772).  Thereafter,

Tag Investments, Ltd., ("Tag") initiated separate adversary proceedings against both Martha and

Adam Monaco.  Tag sought nondischargeability of a debt stemming from construction of a

residence and the adversary proceedings were consolidated.

1.      *Jurisdiction and Venue*.

This Court has jurisdiction to render a final judgment in this core proceeding pursuant to

28 U.S.C. § 157(b)(2)(I).  Venue is appropriate under 28 U.S.C. §§ 1408 & 1409(a).

2.      *Background*.

Tag as owner and BBM as general contractor entered into a construction contract to build

a home in San Antonio, Texas.  During construction, financial disputes arose between the parties

and Tag terminated BBM from the project.  Tag's claim against the Debtors is based on Chapter

162 of the Texas Property Code, which creates a construction trust fund and imposes criminal

liability on owners and officers of an entity who misappropriate trust funds.  Because Debtors

were owners and officers of BBM, Tag invoked section 523(a)(4) of the Bankruptcy Code to

obtain a judgment declaring the debt nondischargeable "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny."

After a bench trial, this Court determined that Tag's claim against Adam Monaco was

nondischargeable pursuant to section 523(a)(4).  (ECF No. 61).  The Court awarded judgment

against Adam Monaco in the amount of $171,942.00 and a take-nothing judgment in favor of

Martha Monaco.  Findings of fact and conclusions of law were stated on the record following the

close of the evidence pursuant to FED. R. BANK. P. 7052.  Adam Monaco filed an appeal and Tag

2

cross-appealed to the United States District Court for the Western District of Texas. (ECF No. 72 & 75).

On March 1, 2013, the Honorable Harry Lee Hudspeth, United States District Court, Western District of Texas, issued a memorandum opinion that vacated the judgment and remanded the proceeding for additional findings of fact and conclusions of law. (ECF No. 87 & 88). The district court directed this Court to address three specific issues: "(1) whether Tag has standing to recover for payments made by San Antonio Release [sic] Management; (2) if so, whether Monaco is entitled to a setoff for amounts withheld as retainage; and (3) the basis for the calculation of actual damages owed to Tag." (ECF No. 87 at 8). The Court will address each of those points in turn and hereby makes additional or amended findings and conclusions.

Adam Monaco was president and sole shareholder of BBM and Martha Monaco served as its secretary. Tag is a limited partnership in which Theresa and Gabriel Khodr are the limited partners. Liacom, Inc. is Tag's general partner, and Theresa Khodr serves as the president of Liacom, Inc.

On April 22, 2004, Tag entered into a contract ("Prime Contract") with BBM for the construction of a luxury residence in San Antonio, Texas ("the Project"). BBM agreed to serve as general contractor, and the Prime Contract detailed the scope of the general contractor's work and described in detail the methods for obtaining payment from Tag. (Pl.'s Ex. 1). To receive payment, BBM was required to submit an application for payment to the project architect, Roy Braswell, for evaluation, review, and certification. Mr. Braswell would then review the progress of the work and certify the amount Tag owed to BBM up to the date of the inspection. Upon approval by BBM, Mr. Braswell then issued certificates for payment to Tag for all amounts that were due to date, less the contractual eight percent retainage. The parties referred to these

3

certificates for payment as draw requests.  As a condition of these payments, BBM was required to present sworn statements to Tag that all subcontractors and suppliers had been paid and lien releases had been obtained.  (*Id*.).

Tag paid BBM all amounts certified by Mr. Braswell until the thirteenth draw request, which Mr. Braswell certified in a lesser amount than what BBM requested.  This led to a series of disputes between the parties over whether BBM had actually paid the subcontractors and suppliers as Adam Monaco had verified in the lien release affidavits.  BBM submitted its fourteenth draw request for $138,553.08. (Tr. 134, Nov. 2, 2011).  Tag refused to pay any of the fourteenth draw request.

On December 7, 2005, BBM filed suit against Tag in state district court to foreclose on a mechanics and materialmen's lien for $308,968.82 that it filed against the residence for sums that Tag allegedly owed to BBM in connection with the Project.  Sometime between December 26, 2005, and January 4, 2006, Tag terminated BBM as the general contractor on the Project.  (Tr. 176, Nov. 2, 2011).  By this point, Tag had paid BBM $1,732,996.18 over the course of thirteen draw requests.  (Tr. 132–33, Nov. 2, 2011).  On February 7, 2006, Tag filed a counterclaim against BBM in the state court lawsuit, and it later asserted third party claims against the individual Debtors on November 6, 2007.  BBM and the individual Debtors all filed Chapter 7 shortly before trial.

During the time following the termination of BBM, multiple subcontractors and suppliers working on the Project filed mechanics and materialmen's liens against the residence.  Tag hired San Antonio Realease Management, Inc. ("SARMECO") to replace BBM as the general contractor under the Prime Contract.  (Tr. 184–87, Nov. 2, 2011).  Theresa Khodr testified that she also held an ownership interest in SARMECO (Tr. 186–87, Nov. 2, 2011), and the checks

4

issued by SARMECO all bear Theresa Khodr's signature as its president.  SARMECO paid all of the subcontractors and suppliers to release the liens against the residence.  (*Id*.).  Tag then reimbursed SARMECO for the payments it made to the lien claimants.  (Tr. 126–27; 185, Nov. 2, 2011).  In addition, SARMECO assumed the subcontracts between BBM and the subcontractors because a provision in the original subcontracts allowed a subsequent general contractor to assume the subcontracts in the event of BBM's termination.  (Tr. 184–87, Nov. 2, 2011; Pl.'s Ex. 23).  In explaining why a subsequent contractor would pay off the liens on Tag's property, Theresa Khodr testified that the "[substitute general] contractor obviously didn't want liens on us . . . from the start."  (Tr. 184, Nov. 2, 2011).  According to Theresa Khodr, Tag was not allowed to assume the subcontracts itself "[b]ecause the contractor could only assume the contract."  (*Id*. at 186).[1]  The assumption agreements between SARMECO and the subcontractors provided that both parties agreed to furnish all materials and perform all work necessary to complete the subcontract, and that SARMECO assumed the obligation to make payments in accordance with the assumption agreement.  (*See, e.g.*, Pl.'s Ex. 23). The assumption agreements stated that all terms and provisions in the original subcontract remained in full force unless modified or otherwise supplemented.  (*Id*.).

Tag's allegation that the Debtors misappropriated trust funds in violation of the Texas Construction Trust Fund Act ("CTFA") lies at the heart of this nondischargeability proceeding. The CTFA's purpose is to protect laborers and materialmen in construction payment disputes. *See Dealers Elec. Supply Co. v. Scoggins Const. Co*., 292 S.W.3d 650, 658 (Tex. 2009).  Under

---

[1] Section 7.4 of the BBM and Leeder subcontract, titled "Assignment of the Subcontract" stated:  "In the event of termination of the Prime Contract by the Owner, the Contractor may assign this Subcontract to the Owner, with the Owner's agreement, . . . [and] the Owner shall assume the Contractor's rights and obligations under the Subcontract Documents."  (Pl.'s Ex. 23).  Thus, upon termination BBM could have assigned the subcontract to Tag if Tag had agreed to accept the assignment.

5

the CTFA, construction payments become trust funds "if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state." TEX. PROP. CODE ANN. § 162.001(a) (West 2014). "A contractor . . . who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds." *Id*. § 162.002. In turn, a subcontractor who furnishes labor or material for an improvement on a specific piece of real property "is a beneficiary of any trust funds paid or received in connection with the improvement." *Id*. § 162.003(a). Construction trust funds are misapplied when a trustee "intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds." *Id*. § 162.031(a).

The CTFA provides that misapplication of trust funds is a criminal offense. *Id*. § 162.032. While state law would create a trust fund any time payments are made to a contractor or subcontractor for the construction of improvements on specific real property, federal case law recognizes trust fund property for the purposes of 11 U.S.C. § 523(a)(4) at the time the proceeds are misapplied. *Airtron, Inc. v. Faulkner* (*In re Faulkner*), 213 B.R. 660, 666 n.10 (Bankr. W.D. Tex. 1997) (Clark, J.) (citing *Coburn Co. of Beaumont v. Nicholas* (*In re Nicholas*), 956 F.2d 110, 114 (5th Cir. 1992)). Texas courts construe the statute broadly to "protect the presumably 'exposed' subcontractor or supplier." *Faulkner*, 213 B.R. at 668. The Fifth Circuit has recognized that a violation of the fiduciary duty under the CTFA for misapplied trust funds falls within the purview of 11 U.S.C. § 523(a)(4). *Nicholas*, 956 F.2d at 113.

While section 162.031(a) supplies a mental state for a violation of the CTFA, federal law governs the mental culpability requirement for purposes of nondischargeability under section

6

523(a)(4).  *Faulkner*, 213 B.R. at 667 n.15 (citing *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 184 (5th Cir. 1997)).  Formerly, the Fifth Circuit standard for defalcation was that "a 'willful neglect' of fiduciary duty constitutes a defalcation—essentially a recklessness standard." *Schwager*, 121 F.3d at 185.  Recently, however, the Supreme Court unanimously decided the appropriate mental standard for defalcation.  *See Bullock v. BankChampaign, N.A.*, __ U.S. __, 133 S. Ct. 1754 (2013).  The Supreme Court defined defalcation with a culpable state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id*. at 1757.  *Bullock* further stated that where actual knowledge of wrongdoing is absent, conduct rises to the level of recklessness "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id*. at 1759 (citation omitted).

The Court characterized its defalcation requirement as a higher standard than "objective recklessness." *Id*. at 1761.  Therefore, *Bullock* requires courts within the Fifth Circuit to apply a somewhat higher standard than formerly applied to defalcation under section 523(a)(4).  This is because, under the formerly applicable "willful neglect of fiduciary duty" standard, willfulness was measured "by reference to what a reasonable person in the debtor's position knew or reasonably should have known." *Office of Thrift Supervision v. Felt* (*In re Felt*), 255 F.3d 220, 226 (5th Cir. 2001).  Willful neglect was an objective standard that charged a debtor with knowledge of the law without regard to his intent or motive.  *Id*.  *Bullock* now requires an intentional wrong that encompasses "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Bullock*, 133 S. Ct. at 1759.  Plaintiffs carry the burden of proof in a nondischargeability proceeding. *Nicholas*, 956 F.2d at 114.

7

3.      *Amendments to the CTFA*.

The legislative history of the CTFA adds a peculiar wrinkle to this case because the statute was amended in 2009.  *See* Acts 2009, 81st Leg., ch. 1277 (H.B. 1513), § 3 eff. Sept. 1, 2009 (amending TEX. PROP. CODE ANN. § 162.003).  Before 2009, beneficiaries under the statute included unpaid laborers and materialmen but not the owners who paid funds to the contractor. *See* ***Lampman v. Lee*** (***In re Lee***), 230 B.R. 810, 813 (Bankr. N.D. Tex. 1999).  Effective September 1, 2009, the Texas legislature amended the statute to include a property owner as a beneficiary of trust funds relating to a residential construction contract.  *See* TEX. PROP. CODE ANN. § 162.003(b) (West Supp. 2014).

Here, because BBM and Tag executed the Prime Contract in 2004 when the CTFA did not extend beneficiary status to property owners, Tag was not a beneficiary under the statute. (ECF No. 59).[2]  That portion of the Court's ruling was not appealed.  Recognizing this lack of direct statutory standing under the CTFA, Tag asserted a right to equitable subrogation in its complaint and at trial.

4.      *Equitable Subrogation*.

The first issue is whether Tag has standing to recover for payments made by SARMECO. (ECF No. 87).  By framing this question as one of standing, the district court implicitly recognized that the Court must have subject matter jurisdiction, even if the parties do not raise the issue.  *See* ***Dynasty Oil & Gas, LLC v. Citizens Bank*** (***In re United Operating, LLC***), 540 F.3d 351, 354–55 (5th Cir. 2008) (stating that "[s]tanding is a jurisdictional requirement, and [courts] are obliged to ensure it is satisfied regardless whether the parties address the matter").

---

[2] *See also* ***O'Brien v. Hartnett*** (***In re Hartnett***), No. 10-53290, 2011 WL 6210625, at *5–6 (Bankr. W.D. Tex. Dec. 14, 2011) (Akard, J.) (holding that the amended definitions in section 163.003(b) do not apply retroactively to conduct that occurred prior to the effective date of the amendment).

Further, standing frequently becomes an issue in the context of equitable subrogation. According to the Texas Supreme Court, "[t]he doctrine of equitable subrogation allows a party who would otherwise lack standing to step into the shoes of and pursue the claims belonging to a party with standing." *Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd*., 259 S.W.3d 140, 142 (Tex. 2008). Because Tag is purporting to assert rights obtained from SARMECO, it must be determined whether SARMECO had standing to assert claims against the Debtors. If SARMECO had standing, then the Court will consider whether Tag can take advantage of SARMECO's standing through equitable subrogation.

   a.  *SARMECO had standing to pursue claims against the Debtors*.

Like Tag, SARMECO's right to assert claims against the Debtors would be dependent upon equitable subrogation. The equitable subrogation doctrine "essentially allows a subsequent lienholder to take the lien-priority status of a prior lienholder." *Bank of Am. v. Babu*, 340 S.W.3d 917, 925 (Tex. App.—Dallas 2011, pet. denied); *see also LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) (stating "[t]he doctrine allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to the security interest against the debtor"). In the context of equitable subrogation, the term standing explains the ability of "one party to stand in the shoes of another as a plaintiff . . . ." *Frymire*, 259 S.W.3d at 142 n.4. Texas courts interpret the doctrine of equitable subrogation liberally and apply it "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Id*. at 142 (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co*., 236 S.W.3d 765, 774 (Tex. 2007)). The general purpose of equitable subrogation is to

9

prevent unjust enrichment of the debtor that owed the debt being paid.  ***First Nat'l Bank of Kerrville v. O'Dell***, 856 S.W.2d 410, 415 (Tex. 1993).

The party seeking to establish a right to equitable subrogation bears the burden of proof to show that the right exists.  ***Babu***, 340 S.W.3d at 925–26.  Placing this burden on the party seeking to invoke the doctrine is consistent with the concept that the party seeking to invoke a court's jurisdiction has the burden to prove standing.  *See **Alvarado Land Dev., Inc. v. Sewell** (**In re Sewell**)*, 413 B.R. 562, 568 (Bankr. E.D. Tex. 2009).  Thus, Tag had the burden to demonstrate that SARMECO (1) involuntarily (2) paid a debt primarily owed by another (3) in a situation that favors equitable relief to prevent unjust enrichment.  *See **Frymire***, 259 S.W.3d at 142.

> i.  ***SARMECO's payments to the subcontractors and suppliers were involuntary***.

The involuntary payment requirement of equitable subrogation is the most frequently litigated aspect of the doctrine.  ***Frymire***, 259 S.W.3d at 144–45.  As defined in ***Frymire***, "[a] payment is voluntary when the payor acts without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property."  ***Id***. at 145 (internal quotations omitted).  Texas courts are consistently lenient in finding that involuntary payments have occurred.  *See **id***. Further, "money paid by one, who in good faith believed such payment necessary to protect his interest, even though he be mistaken as to the facts, is not a volunteer."  ***Coke v. Bargaimes***, 116 S.W.2d 904, 907 (Tex. Civ. App.—Dallas 1938, writ dism'd).

SARMECO replaced BBM as the general contractor and assumed the Prime Contract as well as the subcontracts originally between BBM and the subcontractors and suppliers.  The

10

assumption agreements between SARMECO and the subcontractors are critical because they each recognized the amounts due to the subcontractors under the original subcontracts, required payment in that amount, and stated that SAREMCO assumed the obligation to complete payment in accordance with the agreement.  (*See* Pl.'s Exs. 19–23).  Further, the assumption agreements provided that unless otherwise modified, "all terms, provisions, obligations, responsibilities and other agreements" contained in the original subcontracts remained in full force with SARMECO.  (*Id*.).  As an example of the subcontract terms that applied to SARMECO, section 4.7 of the Leeder subcontract stated that if the general contractor did not pay the subcontractor on time then the subcontractor had the right to "stop the Work of this Subcontract until payment of the amount owing has been received."  (*See* Pl.'s Ex. 23).  Section 11.1 of the AIA subcontract also called for the general contractor, rather than the owner, to make all payments to the subcontractors and suppliers.  (*See id*.).  Thus, when SARMECO assumed the subcontracts between BBM and the subcontractors and suppliers it undertook the same obligation to pay the subcontractors as BBM.  Otherwise, the subcontractors had the right to discontinue work until SARMECO paid them.

Applying ***Frymire's*** reasoning to the contractual provisions in this case supports the conclusion that SARMECO was not a volunteer.  By assuming the subcontracts, SARMECO undertook both legal and practical obligations to pay the subcontractors.  *See **Frymire***, 259 S.W.3d at 145 (stating that a payment is voluntary if it is made without "any legal obligation to make payment, and without being compelled to do so for the preservation of any rights").  The express terms of the assumption agreements placed a legal obligation on SARMECO to pay the subcontractors.  Moreover, the subcontractors needed to be paid to resolve the work stoppage permitted by section 4.7 of the subcontracts.  Without the subcontractors completing their work, SARMECO could not fulfill its duty to Tag to complete the Project.  Perhaps SARMECO

voluntarily assumed the Prime Contract and subcontracts, but once the assumption occurred, its duty to honor those contracts was no longer voluntary. *Id*. at 146 ("Frymire's decision to contract with Price Woods was voluntary; its duty to honor that contract was not"). Accordingly, like the plaintiff in *Frymire*, SARMECO made involuntary payments because it "acted to satisfy a legal obligation and to protect its interests under the contract." *Id*.

ii.    *SARMECO paid a debt primarily owed by BBM*.

The second equitable subrogation requirement is that SARMECO needed to pay a debt primarily owed by another. *Frymire*, 259 S.W.3d at 142. At first blush this requirement appears easily satisfied. Obviously, SARMECO's payments released liens against Tag's property. In the context of this CTFA dispute, however, BBM rather than Tag is the entity that allegedly owed the debt SARMECO paid.

Once again, *Frymire* is instructive on this point. Frymire's insurer fulfilled a contractual obligation to pay a hotel for damages caused by work Frymire performed. While acknowledging that it owed a debt to the hotel for repayment of its damages, Frymire contended that another party, Jomar, was also liable. The Texas Supreme Court was persuaded that Frymire met its burden to provide evidence "that Jomar [was] primarily responsible for the resulting damage." *Frymire*, 259 S.W.3d at 144. The court observed that satisfying a contractual debt Frymire owed "[did] not foreclose the existence and satisfaction of another debt owed by Jomar to the hotel." *Id*. at 143.

In this case, two parties allegedly owed a debt to a creditor based upon competing legal theories. Tag's debt, while not of the contractual sort involved in *Frymire*, arose from the statutory liens imposed on its property. The Debtors' liability, like the defendant Jomar, is based on tortious conduct. *See id*. at 142 (alleging claims against Jomar premised on negligence,

12

product liability, and breach of warranty). Like the insurer in *Frymire*, SARMECO paid the debt one of the two parties owed to the creditor (the subcontractors) and sought to stand in the shoes of the creditor to seek repayment from the other non-paying party. It is evident that SARMECO paid a debt owed by Tag because this resulted in the liens against Tag's property being released. *Frymire* establishes that such a payment does not prevent SARMECO from being equitably subrogated to the ability to pursue a different cause of action against a different debtor. Whether the debt SARMECO paid to the subcontractors was technically owed by Tag or the Debtors, what matters under *Frymire* is that SARMECO paid a debt owed by another.

> ### iii. *SARMECO made its payment in a situation that favors equitable relief to prevent unjust enrichment*.

The equitable doctrine of unjust enrichment dictates how the third prong of equitable subrogation fits within a case. *See Frymire*, 259 S.W.3d at 146. Unjust enrichment applies to situations where "one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Tag paid BBM trust fund money that was meant to be paid downstream to the subcontractors and suppliers. Instead of paying the trust fund money to subcontractors, BBM kept the money or spent it in violation of the CTFA. Thereafter, the subcontractors remained unpaid, filed lien claims, and stopped work so that SARMECO had to step in and pay them to restart the job. BBM and its sole shareholder obtained the benefit of keeping the money that the subcontractors were rightfully owed. Significantly, Adam Monaco verified in writing that the subcontractors had been paid in full and had released their lien rights against Tag, which was a false representation. (Tr. 116–18, 122–24, Nov. 10, 2011; Oral Ruling, ECF No. 59 at 5 & 7,

13

Jan. 19, 2012). At a minimum, the false representations establish that Adam Monaco and BBM "obtained a benefit from another by . . . the taking of an undue advantage." *Heldenfels Bros.*, 832 S.W.2d at 41.

Denying recovery of the trust funds, whether it be by the subcontractors or SARMECO standing in their shoes, would enable Adam Monaco and BBM to be unjustly enriched by the misapplied trust funds and falsified documents. Permitting a contractor to retain misapplied trust funds constitutes unjust enrichment. The Court finds that SARMECO is entitled to equitable subrogation.

b.    ***Tag has a right to equitable subrogation by standing in SARMECO's shoes***.

Having concluded that SARMECO is equitably subrogated to the rights of the subcontractors and suppliers, it is still necessary to determine whether *Tag* can be equitably subrogated to those same rights from SARMECO. Again, it was Tag's burden to show that it (1) involuntarily (2) paid a debt primarily owed by another (3) in a situation that favors equitable relief to prevent unjust enrichment. *See Frymire*, 259 S.W.3d at 142.

Tag's reimbursement of SARMECO's payment to the subcontractors and suppliers was mentioned briefly during the trial in this Court. During one exchange, the Debtors' counsel was cross-examining Theresa Khodr:

> *Q.*    Who's the signer . . . what account was that account—was that—On whose account was that check written?
>
> *A.*    San Antonio Realease Management.
>
> *Q.*    San Antonio Realease Management, Inc.; right?
>
> *A.*    Inc.
>
> *Q.*    And that's not Tag?

14

*A.*     No.

*Q.*     So, Tag didn't pay this debt?

*A.*     *Tag paid San Antonio Realease Management.*

*Q.*     No. No. No. That's not what I asked you.

*A.*     Oh. Tag did not pay this check.

*Q.*     San Antonio Realease Management, Inc., paid that check; right?  And they paid the next check on—on March 10th, 2006 . . . right?  Of which you're claiming you want to be paid today?  Part of your lawsuit, you're claiming that you had—that—Part of your complaint is that there was unpaid lien claims—

*A.*     Yes.

*Q.*     —that—that had to be paid?

*A.*     Yes.

*Q.*     But Tag didn't pay those two lien claims, did it, only San Antonio Realease   Management, Inc.? . . . That is the check; right?

*A.*     That is the check. That's correct.

. . . .

*Q.*     Not one of the alleged unpaid lien claims were paid by Tag, according to your documents, were they?

*A.*     They were paid by San Antonio Realease Management.

(Tr. 126–27, 129, Nov. 2, 2011) (emphasis added).  In another exchange, the Court engaged in a

colloquy with Theresa Khodr as follows:

*Court*:     Before I forget, I want to ask her one question.  Have a seat, ma'am.  Why did you pay the Bexar Electric, Schultz, Professional Plumbing, and Leeder with S.A. Realease Management checks rather than Tag?

*Witness*:   We—We—*According to the contract, we could assume their contracts, the next contractor could. And that contractor obviously didn't want liens*

*on us from—from the start, so we repaid San Antonio Realease Management.*

*Court*: Who's "we"? Tag?

*Witness*: *Tag—*

*Court*: Okay.

*Witness*: *—paid San Antonio Realease Management for all those costs to assume the contract.*

*Court*: *So, San Antonio Realease Management paid the subcontractor*, for example, Bexar Electric, *and then Tag reimbursed San Antonio Realease Management*?

*Witness*: *Yes.* And—And San Antonio Realease Management actually assumed the initial contract, so we didn't have to renegotiate.

*Court*: The initial contract between—

*Witness*: [BBM].

*Court*: —[BBM] and, say, Bexar Electric,—

*Witness*: And—

*Court*: —the subcontractor?

*Witness*: Yes.

*Court*: Okay.

*Witness*: Because it required them to be able to—This is my under—understanding.

*Court*: Okay. And you didn't want Tag to assume that contract?

*Witness*: No.  Because the contractor could only assume the contract.

*Court*: Okay.

*Witness*: And San Antonio Realease Management is the contractor, the substitute contractor.

| | |
|---|---|
| *Court*: | Oh.  In other words, after the contract with—with [Building by] Monaco was terminated, your new contractor was San Antonio Realease? |
| *Witness*: | Yes. |
| *Court*: | *But that's a company that you own*? |
| *Witness*: | *It's company that we own for doing management,—* |
| *Court*: | Okay. |
| *Witness*: | *—to finish out construction*. |
| *Court*: | Okay. It's just another company? |
| *Witness*: | Yes. |

(Tr. 184–87, Nov. 2, 2011) (emphasis added).

The above testimony describes the relationship between Tag and SARMECO from the perspective of Theresa Khodr.  The Khodrs own both entities.  Theresa Khodr signed the checks for SARMECO (*see, e.g.*, Pl.'s Ex. 23), and she signed the assumption agreements for SARMECO as its president.  (*See, e.g.*, ***id***.).  Theresa Khodr's signature also appears on checks drawn on Tag's bank accounts.  (*See, e.g.*, Pl.'s Ex. 3).   She is listed as Tag's representative in the Prime Contract between Tag and BBM (Pl.'s Ex. 1), which she signed in dual capacities as president of Liacom, Inc., the general partner of Tag, and she also signed in her individual capacity as an owner of Tag.  (***Id***.).  Tag reimbursed SARMECO and Theresa Khodr personally signed and issued the checks for both entities.

This evidence shows *why* Tag reimbursed SARMECO for making the lien release payments and whether Tag's decision to do so was voluntary or not.  Critical to this point is Theresa Khodr's statement "[a]ccording to the contract, we could assume their contracts, the next contractor could.  And that contractor obviously didn't want liens on us . . . from the start,

17

so *we repaid San Antonio Realease Management.*"[3]  (Tr. 185, Nov. 2, 2011) (emphasis added). This statement shows Tag's concern about the liens on the property and raises additional lien issues.

Section 53.251, *et seq.* of the Texas Property Code specifically applies to residential construction projects while incorporating other provisions of Chapter 53 relating to filing liens.[4] TEX. PROP. CODE ANN. § 53.251 (West 2007).  "Because a derivative claimant has no contractual relationship with the property owner, the claimant is required to give the property owner timely notice of an unpaid balance before attempting to file a lien against the property."  ***Morrell Masonry Supply, Inc. v. Loeb***, 349 S.W.3d 664, 667 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing TEX. PROP. CODE ANN. § 53.252(b)).  The subcontractors and suppliers in this case presented this notice to Tag, thus triggering the applicable lien remedies.

Section 53.252(c) cross-references the "fund trapping" statute contained in section 53.081 *et seq.*  "Trapping provisions are designed to prevent an owner from paying a contractor monies so long as the subcontractor or supplier remains unpaid."  ***Baker Hughes Oilfield Operations, Inc. v. Summerline Asset Mgmt., LLC*** (***In re S. Tex. Oil Co.***), No. 09-52433, 2010 WL 1903750, at \*1 (Bankr. W.D. Tex. May 10, 2010).  Providing notice under section 53.252 allows the owner to "withhold from payments to the original contractor an amount necessary to pay the claim for which he receives notice."  TEX. PROP. CODE ANN. § 53.081(a) (West 2007).  The original contractor must also receive notice under the statute in time for the contractor to notify

---

[3] Theresa Khodr then clarified she used the term "we" as a reference to Tag.

[4] It is unclear whether section 53.251, *et seq.* would actually apply here because the residential property was owned by Tag, a limited partnership.  The definition of a "residence" in Chapter 53 requires that it be "owned by one or more adult persons."  TEX. PROP. CODE ANN. § 53.001(8).  For purposes of this discussion the definitional distinction is immaterial because all roads in Chapter 53 eventually lead to section 53.081, *et seq.*, which creates the fund-trapping provision that the liens were asserted under in this case.  The Court mentions the distinction out of an abundance of caution because the district court's opinion stated:  "Gabriel and Theresa Khodr, the individuals for whom the home was being built."

the owner of its intent to dispute the claim that the subcontractor or supplier remained unpaid. *Id*. § 53.083(b).[5]   If the contractor does not provide the owner with timely notice of its intent to dispute the claim "[the contractor] is considered to have assented to the demand and *the owner shall pay the claim.*"  *Id*. (emphasis added).   Further, once the owner receives the statutory notice, the "fund-trapping" provision is effective and the owner's property is subject to a lien for any additional payments to the original contractor while the subcontractor's claim remains unpaid.  *Id*. § 53.084(b); *see also **Morrell Masonry Supply, Inc***., 349 S.W.3d at 668.

"The funds remain trapped until the earlier of (a) settlement, discharge, or indemnification of the claimed amount, (b) passage of the time for filing an affidavit of mechanic's lien, or (c) satisfaction or release of a filed mechanic's lien." ***In re Medina***, 413 B.R. 583, 591 (Bankr. W.D. Tex. 2009) (Clark, J.) (citing TEX. PROP. CODE ANN. § 53.082).   In ***Medina***, Judge Clark explained the practical effect of the "fund trapping" provision:

> The owner is motivated to both withhold funds from the original contractor upon receipt of a Notice of Claim and a Demand for Payment, *and to actually pay off the claim*, for two reasons.   First, the owner knows that, if claim is not satisfied, then eventually the claimant will file an affidavit of lien, placing a lien on the owner's property.   The cloud on the owner's title would obviously need to be removed before permanent financing could be obtained on the project (or before the project could be sold).   Second, *the owner also knows that it could eventually become personally liable to the claimant for the amount of the claim once the authorization to withhold has been triggered*, even though there was no prior privity of contract between the owner and the claimant.  *See* TEX. PROP. CODE ANN. § 53.084(b).

*Id*. at 591–92 (emphasis added).   The owner's liability extends only to any payments made to the original contractor *after* receiving the fund-trapping notice.   TEX. PROP. CODE ANN. § 53.084(a) ("Except for the amount required to be retained, . . . the owner is not liable for any amount paid

---

[5] An "original contractor" is defined in Chapter 53 not as the first party to contract with the owner but as "a person contracting with an owner either directly or through the owner's agent."  TEX. PROP. CODE ANN. § 53.001(7).  Both BBM and SARMECO had a contract directly with Tag and were original contractors.

19

to the original contractor before the owner is authorized to withhold funds"). Finally, "the owner is liable for [the fund-trapping] amount in addition to any amount for which he is liable under [the retainage provisions of Chapter 53]." *Id*. § 53.084(b).

The parties at trial did not contest the validity of the liens or the notices. The record does not contain evidence that the Debtors disputed the subcontractors' notice of unpaid amounts, and without establishing a dispute, "[the contractor] is considered to have assented to the demand and the owner shall pay the claim." *Id*. § 53.083(b).[6] Therefore, presuming the liens were valid, the subcontractors created an enforceable obligation against Tag.

Although SARMECO initially paid the amounts in question, the liens established a right to payment from Tag that was involuntary. The fact that Tag utilized SARMECO as the conduit for payment does not alter this conclusion. Tag reimbursed SARMECO for the initial payment and therefore Tag ultimately bore the entire cost to remove the liens that were involuntarily placed against its property. More importantly, preserving property rights fits within the Texas Supreme Court's definition of involuntariness. *See Frymire*, 259 S.W.3d at 145 (stating that a payment is voluntary when it is made "without being compelled to do so for the preservation of any rights or property").

The only reason liens were placed against Tag's property was because BBM did not pay the subcontractors the amounts they were owed. Thus, Tag "paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Frymire*, 259 S.W.3d at 142. Further, the fact that Tag, in some instances, paid twice—once to BBM and once to SARMECO—to compensate the subcontractors also supports equitable subrogation because the

---

[6] Adam Monaco did dispute the architect's purported changes to BBM's fourteenth draw request. Adam Monaco disputing what his company was owed by Tag is distinguishable from disputing amounts allegedly unpaid to subcontractors and suppliers.

doctrine's general purpose is to prevent unjust enrichment of the debtor that owed the debt being paid. *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993). In sum, Tag is entitled to assert its claims against the Debtors through equitable subrogation because it (1) involuntarily (2) paid a debt primarily owed by another (3) in a situation that favors equitable relief to prevent unjust enrichment. *See Frymire*, 259 S.W.3d at 142.

5.    ***The Total Amount of Misapplied Trust Funds is $171,942.03.***

The remand order also directed this Court to specifically address "the basis for the calculation of actual damages owed to Tag." The appealed judgment held that Adam Monaco misapplied trust funds in the amount of $171,942.00. To calculate this sum, the Court looked to the payments SARMECO made to the subcontractors and suppliers that were above and beyond what BBM received. Again, because the unchallenged testimony of Theresa Khodr was that Tag reimbursed SARMECO the Court looked to SARMECO's payments as the best evidence of what BBM failed to pay the subcontractors and suppliers from the trust funds it had already received.

The record contains seven copies of checks that SARMECO wrote to subcontractors and suppliers to release the liens on Tag's property and compensate them for what BBM had already received but failed to pay. These seven checks total $154,141.37. The $154,141.37 total reflects:

- A $58,625.00 payment to Pyramid Stone.

- A $27,500.00 payment to Pyramid Stone.

- A $4,016.91 payment to Bexar Electric Company.

- A $2,227.50 payment to Schultz & Co. Landscaping.

- A $3,088.00 payment to Professional Plumbing.

- A $45,714.40 payment to Leeder Masonry.

21

- A $12,969.56 payment to Leeder Masonry.

These seven checks do not entirely reconstruct the amount of trust funds that BBM misapplied and failed to pass along to the subcontractors and suppliers. For reasons that are not entirely clear, SARMECO placed a condition on the payment to Leeder Masonry that was not imposed on the other subcontractors. Like all of the assumption agreements included in the record, the agreement between SARMECO and Leeder Masonry reflects the amount that the subcontractor claimed it was owed following BBM's termination. Unlike the other assumption agreements, however, the Leeder Masonry agreement reflects that SARMECO withheld a ten percent retainage from what Leeder was owed. This retainage sum reflects money that was already due and payable to Leeder and for which BBM withheld the trust funds. SARMECO and Leeder simply agreed not to have the outstanding balance immediately paid in full. Calculating the additional amount that Leeder was owed—but that SARMECO retained—reveals an additional $17,800.66 that BBM withheld from Leeder.[7] Theresa Khodr testified this retained amount was eventually paid. (Tr. 80–81, Nov. 2, 2011).

Adding this $17,800.66 to the $154,141.37 results in an amount of $171,942.03. Therefore, the Court concludes that BBM, at Adam Monaco's direction, misapplied $171,942.03 in trust funds that it had received from Tag but failed to pay to the subcontractors and suppliers.

Although not directed to do so by the remand order, out of an abundance of caution this Court will address Adam Monaco's conduct under the standards elucidated in ***Bullock v.***

---

[7] The assumption agreement reflects that Leeder Masonry was owed $177,986.62 on the subcontract it originally signed with BBM. (Pl.'s Ex. 23). Ten percent of this figure is $17,798.66. Elsewhere in the record, on the page reflecting copies of the checks SARMECO wrote to Leeder, a handwritten notation lists the retainage figure at $17,802.66. Theresa Khodr also testified that the additional sum Leeder was owed was $17,802.66. (Tr. 82, Nov. 2, 2011). The Court finds it is reasonable to average these two figures to calculate Debtors' liability. Thus, the Court finds that an additional $17,800.66 is attributable to misapplied trust funds.

*BankChampaign, N.A*., which the Supreme Court decided in May 2013 after this case was remanded.  It is established law in the Fifth Circuit that the CTFA creates fiduciary duties encompassed by section 523(a)(4) "to the extent that it defines wrongful conduct under the statute." *Nicholas*, 956 F.2d at 114.  The CTFA defines wrongful misapplication of trust funds with the mental components of "intentionally or knowingly or with intent to defraud." TEX. PROP. CODE ANN. § 162.031(a).  This is significant because *Bullock* held defalcation while acting in a fiduciary capacity requires intentional wrongdoing or at least reckless conduct similar to "the kind that the criminal law often treats as the equivalent." *Bullock*, 133 S. Ct. at 1759.

The draw requests Adam Monaco certified on behalf of BBM verified under oath that all subcontractors and suppliers had been paid and had released their lien rights against Tag. Obviously, these certifications were untrue because the subcontractors and suppliers eventually asserted lien claims against Tag's property.  The evidence adduced at trial established that BBM failed to pay subcontractors and suppliers with funds received for work already performed.  (Tr. 196–208, Nov. 2, 2011).  Adam Monaco testified that he was responsible for signing and certifying the draw requests (Tr. 7, Nov. 10, 2011), which recited in part "that all amounts have been paid by the Contractor for Work for which previous certificates for payment were issued and payments received from the owner . . . ." (*See, e.g*., Pl.'s Ex. 13).  Adam Monaco made other representations to Tag that BBM had ordered material that had already been delivered, which was also untrue.  (Tr. 123–30, Nov. 10, 2011).

Taken together, this evidence demonstrates that Adam Monaco acted intentionally to obtain further payments from Tag despite not paying the subcontractors and suppliers in violation of the CTFA.  As an officer of BBM he submitted written certifications that all subcontractors and suppliers had been paid.  He intended to obtain payment from Tag and

23

conceal the fact that trust funds had not been used to pay trust beneficiaries.  Such intentional conduct renders the debt nondischargeable under section 523(a)(4) for defalcation while acting in a fiduciary capacity. ***Bullock***, 133 S. Ct. at 1759.

As to Martha Monaco, the Court previously found that she did not participate in the same intentional conduct as her son.  While it is likely that she knew that the subcontractors and suppliers remained unpaid, she did not sign draw requests to verify payments to subcontractors or commit a knowing violation of the CTFA that would rise to the level of intentional wrongdoing or gross recklessness.

6.    ***Adam Monaco is not Entitled to a Setoff for the Amount of Withheld Retainage***.

Finally, the remand order instructed this Court to consider "whether Monaco is entitled to a setoff for the amount withheld as retainage."  There are several reasons why Adam Monaco is not entitled to a setoff.

a.    ***Tag bought the retainage***.

The Debtors could not claim a setoff right to the retainage allegedly owed to BBM because the Chapter 7 Trustee in the BBM bankruptcy sold the retainage to Tag.  The Court takes judicial notice that BBM listed a cause of action as an asset in Schedule B.  The description stated:

> [BBM], Inc. v. Cedar Hill Associates, et al 166th District Court, Bexar County, Texas Suit for breach of contract, *for statutory retainage* and foreclosure of lien in connection with the building of a home for defendants.  Suit seeks damages in the approximate amount of $308,968.82 plus attorneys [sic] fees, court costs and interest.

(Case No. 09-53104-lmc, ECF No. 4) (emphasis added).  Tag was one of the defendants in the state court lawsuit.  Subsequently, the Chapter 7 Trustee filed a motion to sell the estate's interest in the cause of action to Tag for $2,500.00.  (*Id*., ECF No. 35).  On October 8, 2010, Judge Leif

24

Clark granted the motion and approved the agreement to sell BBM's causes of action in the state court lawsuit. (*Id*., ECF No. 39).[8]

Thus, Tag bought BBM's claim to the retainage. Assuming Adam Monaco could claim a setoff right in the retainage of BBM, he cannot set off against an asset that was previously sold by the trustee.

> b. *SARMECO's assumption of the contract after BBM's termination ended BBM's contractual right to collect the retainage*.

The evidence at trial established BBM never completed the Project and was not the general contractor at the time the construction was finished. The Fifth Circuit has recognized a contractor's "failure to pay its subcontractors . . . constituted a material breach of contract occasioning a forfeiture of all rights to the contract retainage held by the [owner]." *Fed. Ins. Co. v. Cmty. State Bank*, 905 F.2d 112, 116 (5th Cir. 1990). The Texas Property Code establishes retainage for the benefit of derivative claimants. *See Exch. Contractors, Inc. v. Comerica Bank-Tex*. (*In re Waterpoint Int'l LLC*), 330 F.3d 339, 344 (5th Cir. 2003). The "retainage secures the payment of any contractor or subcontractor who may assert a lien on the property in the event that the general fails to pay them." *Solar Applications Eng'g, Inc. v. T.A*. *Operating Corp*., 327 S.W.3d 104, 111 (Tex. 2010) (citing TEX. PROP. CODE ANN. § 53.102)).

Since BBM did not complete the Project it was not entitled to the retained funds, which were preserved for the benefit of the unpaid subcontractors. A recent Texas Supreme Court case stated "retainage gives the owner offsetting leverage against the general contractor, whose receipt of the final ten percent of the contract balance is *subject to its payment of the*

---

[8] While the parties did not present evidence of the previous sale of the BBM claim to the retainage funds, this Court takes judicial notice of the order authorizing the sale in the BBM bankruptcy case. *See* FED. R. EVID. 201(d) (authorizing courts to take judicial notice at any stage of the proceeding).

*subcontractors in full*." ***Solar Applications Eng'g***, 327 S.W.3d at 111 (emphasis added). BBM was not entitled to the retainage because it never paid the subcontractors in full.

The Prime Contract also cut off the right to the retainage. Paragraph 9.8.5 of the General Conditions of the Contract for Construction stated that upon submission of a Certificate of Substantial Completion the "Owner shall make payment of retainage applying to such Work or designated portion thereof." (Pl.'s Ex. 1). The architect would only prepare this Certificate "[w]hen the Work or designated portion thereof is substantially complete . . . ." (***Id***., ¶ 9.8.4). In turn, "Substantial Completion" was defined as "the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use." (***Id***., ¶ 9.8.1). The residence was never substantially complete while BBM was the general contractor.

Paragraph 5.2.1 of the Standard Form Agreement provided that "[f]inal payment, constituting the entire unpaid balance of the contract sum, shall be made by the Owner to the Contactor when . . . the Contractor has fully performed the contract . . . and . . . a final Certificate for Payment has been issued by the Architect." (Pl.'s Ex. 1). To obtain final payment, a final Application for Payment must be presented to the architect by the general contractor. (***Id***., General Conditions ¶ 9.10.1). Thereafter, the architect would issue a final Certificate for Payment only after promptly inspecting and finding "the Work acceptable under the Contract Documents and the Contract fully performed . . . ." (***Id***.). This Certificate would state that "the Work has been completed in accordance with the terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable." (***Id***.). This Certificate would "constitute a further representation that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to

final payment have been fulfilled." (*Id*.). The architect never issued BBM a final Certificate for Payment.

Paragraph 9.10.2 of the General Conditions stated that "[n]either final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect" (1) an affidavit stating "bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied"; (2) a certificate stating that insurance was still in effect; (3) a written statement that the contractor knows of no reason why insurance would not be renewed; (4) consent of any surety to final payment; and (5) other miscellaneous items that the owner may require, including proof that liens and other encumbrances against the property have been released or waived. (*Id*., ¶ 9.10.2).

BBM never fulfilled any of these contractual provisions before or after its termination. Therefore, under the Prime Contract's own terms "[n]either final payment nor any remaining retained percentage shall become due . . . ." (*Id*.). Although the ***Federal Insurance*** case applied Louisiana retainage law and a surety took part in the construction, the Fifth Circuit analyzed similar contractual language and concluded the contractor lost its right to retainage funds because:

> [The contractor's] failure to pay its subcontractors . . . constituted a material breach of contract occasioning a forfeiture of all rights to the contract retainage held by the [owner]. Article 9.9.2 of the contract expressly conditioned [the contractor's] right to final payment upon its payment of all outstanding claims. That the project architect had recommended release of the retainage to [the contractor] does not alter this conclusion. The architect was entitled, on the basis of "subsequently discovered evidence," to "nullify the whole or part of any Certificate for payment previously issued" due to "failure of the Contractor to make payments properly to Subcontractors" or "reasonable evidence that the Work will not be completed [on time]."

*Fed. Ins. Co*., 905 F.2d at 116. ***Federal Insurance*** likewise conditioned the contractor's right to payment on architect approval and proof that outstanding financial obligations were not owed to subcontractors. Like the contractor in ***Federal Insurance***, the Debtors failed to prove that BBM was contractually entitled to receive the withheld retainage as a final payment. Adam Monaco cannot setoff against the retainage when BBM was not contractually owed the money. Here, BBM's "failure to pay its subcontractors . . . constituted a material breach of contract occasioning a forfeiture of all rights to the contract retainage held by [Tag]." ***Id***.

In addition, by virtue of assuming the Prime Contract, SARMECO became entitled to the retained funds at the time the contract was completed. The Debtors argued in their appeal that Tag effectively obtained "double recovery" by not applying a credit for the retainage, but this ignores the fact that *SARMECO* paid subcontractors, obtained releases of liens, and assumed BBM's contractual obligations. The evidence established that *SARMECO* paid the subcontractor lien claimants first. Tag later paid SARMECO with the retainage money. Therefore SARMECO and the subcontractors ultimately received the retainage funds. Viewing these events from Tag's perspective, first it paid BBM the trust funds that were misapplied and second it paid SARMECO for many of the same bills from the retainage or additional funds. In many instances, Tag was forced to pay twice for the same work rather than receiving a double recovery.

7.      ***Conclusion.***

The Court finds that Tag had standing to pursue its cause of action by virtue of equitable subrogation; that Adam Monaco misapplied trust funds in the amount of $171,942.03; and that any claims or setoffs relating to retainage are unavailable to him. Pursuant to 11 U.S.C.

§ 523(a)(4) the Court concludes that this $171,942.03 debt is nondischargeable as to Adam Monaco.  The Court's take nothing judgment in favor of Martha Monaco is unaffected.

A judgment will be signed and entered contemporaneously herewith.  This Opinion constitutes the Findings of Fact and Conclusions of Law of the Court pursuant to FED. R. BANKR. P. 7052 and FED. R. CIV. P. 52(a).

# # #